# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| TINA M. MCCOY,<br><br>　　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>UNIVERSITY OF VIRGINIA MEDICAL CENTER, *et al.*,<br>　　　　　　　　　*Defendants*. | CASE No. 3:19-cv-50<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Tina McCoy worked at the University of Virginia ("UVA") Medical Center as a nurse for nearly four years before filing sexual harassment complaints against two coworkers, male nurses Charles Wilson and Ryan Rall. Ultimately, McCoy filed suit against them, UVA, and the Commonwealth. At hand are two motions for summary judgment filed by Wilson, Rall, and UVA. Dkts. 45, 42. Wilson and Rall's motion addresses three of McCoy's claims—assault, battery, and intentional infliction of emotional distress ("IIED"). Dkt. 45. The second motion, filed by UVA, addresses two of McCoy's claims—IIED and hostile work environment under Title VII.[1] Dkt. 42. For the reasons set forth below, the Court will award summary judgment in favor of UVA. The Court will further award partial summary judgment as to Wilson and Rall. The Court will dismiss all counts against Rall and the IIED claim against Wilson. But the Court also finds that a genuine issue of material facts exists as to whether Wilson committed assault and battery.

---

[1] UVA also filed a partial motion for summary judgment about whether McCoy is entitled to back or front damages regarding the Title VII claim. Dkt. 34. The Court will deny this motion as moot for the reasons set forth below.

## I.     Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact. A genuine issue of material fact only exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A plaintiff cannot rely solely on the allegations in their complaint, or "simply show . . . some metaphysical doubt as to the material facts" to defeat summary judgment. *Id.* at 323–24; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The mere existence of contrived factual disputes do not defeat summary judgment. Any dispute must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247. "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.     Procedural History

McCoy filed her initial complaint in Albemarle County Circuit Court on August 8, 2018 against the University of Virginia Medical Center, Wilson, and Rall. Dkt. 1-2. She later filed an amended complaint on July 1, 2019 and added Defendants UVA and the Commonwealth of Virginia. Dkt. 1-3. The amended complaint included eleven counts against the Defendants. On August 19, 2019, the circuit court entered a consent order. In it, the parties agreed to two notable actions. First, McCoy agreed to dismiss the University of Virginia Medical Center from the case. Second, McCoy agreed to dismiss the Commonwealth as a party to her Title VII claims—count

10 (hostile work environment) and count 11 (retaliation). Dkt. 1-1. Defendants removed the case to this Court on September 6, 2019.

Following removal, UVA filed a motion to dismiss the retaliation claim, dkt. 3, which this Court granted, dkt. 58. Later, the Commonwealth, claiming a lack of jurisdiction over the state law tort claims, filed a motion to dismiss—which this Court granted. Dkts. 19, 47.

What remains are: count 1 (assault and battery against Wilson), count 3 (assault and battery against Rall), count 9 (IIED against Wilson, Rall, and UVA), and count 10 (hostile work environment against UVA).

### III.   Facts

#### A.  Background of McCoy's Employment at UVA

McCoy worked at UVA as a registered nurse ("RN") between May 27, 2014 and March 26, 2018. Dkt. 1-3 ¶¶ 29, 70. As an RN, McCoy worked the night shift on 5 East, a unit of UVA's Medical Center, from 7:00 p.m. to 7:00 a.m. Dkt. 43-9 at 82:13–18. Wilson and Rall overlapped with McCoy in their hours at UVA. Rall worked the day shift from 7:00 a.m. to 7:00 p.m. between 2013 and September 2018, dkt. 43-10 at 8:4–5, 17:6–7, 20:21–22, while Wilson primarily worked the evening shift between the hours of 3:00 p.m. and 11:00 p.m., dkt. 43-11 at 81:3–8.

RNs exchange patient reports with incoming nurses for continuity of patient care ("handoffs"). Dkt. 50-4 at 31:18–36:16. McCoy participated in handoffs with day shift nurses each time she started or ended her shift. *Id.* Handoffs take approximately 15–30 minutes. Dkt. 43-9 at 81:17–82:12, 84:18–85-1. For at least some portion of their time together, McCoy handed off patients to Rall. Dkt. 43-12 at 39:1–6. McCoy also knew Wilson, with whom she socialized with outside of work. Dkt. 43-9 at 133:9–134:18. Once, Wilson went to McCoy's home for a "dog-playdate." *Id.*

3

Colleagues perceived both Wilson and Rall as having behavioral issues. One coworker, Mary Ellen Cooper, described Rall as having "no social skills" around women. Dkt. 43-32. Indeed, approximately a year before McCoy's complaint, Rall inappropriately commented on a nursing student's tattoo. Dkt. 50-9 at 21:13–24:11. A third-party reported concerns about the comment to Jill Melton, an Employee Relations consultant at UVA. *Id.* Melton testified that the complaint was not related to sexual harassment concerns. *Id.* She met with Rall to discuss the complaint and gave him an opportunity to respond. *Id.* Rall denied making any inappropriate comments. *Id.* During the meeting, Melton provided coaching on the incident and information about appropriate communication. *Id.* No subsequent action was taken.

UVA employed Wilson during three separate time periods. First, Wilson worked for UVA in the late 1980s while he was a nursing student. *Id.* at 31:1–5. He later returned as an RN from 2003 to 2010. *Id.* at 34:15–20. In 2007, UVA suspended Wilson for five days for sexual harassment complaints from coworkers. Dkt. 46-4 at UVA00000610–12. Wilson appealed UVA's decision through the Commonwealth's grievance procedures. *Id.* Ultimately, the Commonwealth reversed the suspension based upon the finding that Wilson's managers tolerated physical contact between employees. *Id.* at UVA00000615. Wilson left UVA on his own accord in 2010. Dkt. 43-11 at 65:11–12. He returned to UVA on October 27, 2014 as an RN on 5 East. *Id.* at 69:20–22.

With respect to McCoy, co-workers say that she shared intimate details with them about her divorce, her financial situation, and her romantic life. *See* Dkts. 43-13 ¶ 7; 43-14 ¶¶ 4–5; 43-15 ¶ 6. For example, in 2016 McCoy told co-workers about her plans to travel to Nigeria to marry an "African prince" she met online. Dkt. 43-13 ¶ 6. McCoy's fellow RN, Nkese Williams-Hayes—a Nigerian immigrant—warned her that the trip was too dangerous and implored her not to go. *Id.* But McCoy said, "I don't care what happens to me, if I die or if I live." *Id.* McCoy flew to Nigeria

4

to meet the "African prince," but not only was he not a prince, he stole thousands of dollars from her. *Id.*; dkt. 43-9 at 34:18–35:23. In January 2018, McCoy traveled to India and married a man she met online. Dkt. 43-9 at 20:10–17, 26:6–18.

Coworkers also described McCoy as a deeply insecure individual who struggled with her self-image and sought compliments from male and female co-workers alike. Dkts. 43-12 at 44:15– 46:11; 43-13 ¶ 7; 43-14 ¶¶ 4–5; 43-15 ¶ 7. In an attempt to boost her self-esteem, McCoy solicited compliments and reassurances from colleagues by saying that she was "fat" or "ugly." Dkts. 43-12 at 44:15-22; 43-14 ¶¶ 4–5; *see also* 43-19. Both male and female co-workers would assure her that she was neither fat nor ugly, but beautiful. *Id.*

### B. McCoy's Allegations of Sexual Harassment

#### 1. *McCoy's Complaint of Sexual Harassment to Management*

On March 3, 2018, McCoy emailed Nurse Manager Brenda Barrett to express her "concerns about 5 East." Dkt. 43-20. The email discussed McCoy's feelings about management's support of patients and RN staff. *Id.* It did not contain any references to sexual harassment. Barrett and the Assistant Nurse Manager, William Russell, met with McCoy on March 7, 2018 to discuss her email. Dkt. 43-21.

It was during the March 7 meeting that McCoy first notified UVA management about "bad behavior" by Wilson and Rall. Dkt. 43-23. McCoy told the managers that Wilson did "inappropriate things" and made "inappropriate physical contact" with her. *Id.* The misconduct caused McCoy to feel uneasy around Wilson. *Id.* Specifically, McCoy recounted an incident in the medication room, where Wilson stated something to the effect of "you are so sexy and beautiful." *Id.* At the time Wilson made the statement, another male co-worker, James Piccirilli, intervened. *Id.* Barrett called Piccirilli, who confirmed the account. *Id.* McCoy also reported feeling

uncomfortable on a separate occasion when Wilson told her that her new scrub outfit made her look good, that it reminded him of an ex-girlfriend, and that they should get together again for a "date" for the dogs. *Id.*

McCoy also shared a second set of incidents regarding Rall. She told Barrett and Russell that Rall would call her "hot," and tell her that he "didn't care if she was married or not." *Id.* She also said that Rall told her that he "has been after her since they met," and that she should "give up on that Indian guy" because Rall would not stop pursuing her. *Id.*

As a result of McCoy's conversation with management on March 7, UVA placed Wilson and Rall on paid administrative leave. *Id.*

### 2. *Employee Relations Investigation*

Immediately following the complaint, UVA commenced an investigation that lasted three weeks. McCoy declined an investigation by UVA's Equal Opportunity and Civil Rights group ("EOCR"). Instead, McCoy opted for alternative resolution through Employee Relations. Dkt. 43-23 at UVA00364. The Employee Relations department investigates sexual harassment allegations. EOCR trains Employee Relations annually about how to handle sexual harassment investigations. *See* Dkt. 43-8 at 15:10–16, 27:8–28:1.

Jill Melton, an Employee Relations Consultant, conducted the investigation. Dkt. 43-21. In a written statement about Wilson, McCoy said that "he would put his arms around my waist and upper back and squeeze me. Saying things such as your [sic] hot, sexy, beautiful and smart." Dkt. 43-24. She noted that "James [Piccirilli], Jennifer [Martin] and Alexis [Green]" were witnesses to "[t]hese types of things." *Id.* Concerning Rall, McCoy accused him of "talk[ing] trash" and making the following comments:

- "You know you want me, come on give me a chance,"
- "I wanted you from the first day you started here,"

- "You are so beautiful, damn you are just fine so hot,"
- "You knew I wanted you then you just kick me to the curb like an old shoe [sic] married a [sic] Indian man when you could have had me,"
- "You know I'm good looking I'm smart,"
- "I don't care if your [sic] married or not if you change your mind let me know,"
- "I don't give up,"
- "It's a shame everyone said you like old Indian men,"
- "[D]amn your [sic] beautiful,"
- "It would get hard I'm not kidding."

*Id.*

On March 13, 2018, Melton met with McCoy, Barrett, and Russell to review McCoy's allegations and gather more information. During the meeting, McCoy made clear that "she didn't want to get anyone in trouble [sic] that she only wanted the behavior to stop." Dkt. 43-23 at UVA00364. Additionally, she confirmed parts of her written statement, saying "that [Wilson] placed his arm around her shoulders, but could not recall [Rall] touching [her]." *Id.*

As part of the investigation, UVA gathered statements from McCoy's coworkers. They included Green, Martin, Piccirilli, Williams-Hayes, Mary Ellen Cooper, Wilson, and Rall.

### a. Alexis Green

Green, another floor nurse on 5 East, never observed any inappropriate actions between Rall and McCoy. She did, however, recount one instance where Wilson made McCoy uncomfortable. Dkt. 43-25. One day, prior to shift change, Green—while waiting for her handoff from Wilson—came across McCoy and Wilson in the hallway. *Id.* She saw Wilson inches away from McCoy, whispering in her ear and rubbing her arm. *Id.* Green jokingly asked Wilson to "stop flirting" with McCoy. Dkt. 50-2 at 39:8–41:9. He apologized, and said that they were "just talking." *Id.* At a later time, McCoy told Green that she had felt uncomfortable with Wilson's behavior and that she was thankful Green stepped in. Dkt. 43-25.

### b.  Jennifer Martin

Martin, the charge nurse on 5 East, provided two written statements. Dkts. 43-26; 43-27. In her first written statement, Martin referenced "multiple occasions," which she later clarified as only "two times," where Wilson told McCoy "she was very attractive." Dkts. 43-26; 43-28 at 99:5–15. Martin also reported that Wilson asked out McCoy multiple times, even after McCoy said she was not interested and after she had asked him to stop talking to her about dating. Dkt. 43-26. McCoy shared with Martin concerns about how Wilson would not leave her alone. *Id.* Eventually, McCoy asked Martin to assign handoffs in a way where McCoy would not have to handoff to Wilson. *Id.* Martin's first statement also mentioned McCoy's interactions with Rall. She stated that Rall would say that "it was o.k. if Tina was married—it wouldn't make a difference—they could still go out." *Id.* McCoy repeatedly asked Rall to stop talking that way. *Id.*

Martin's second statement mentioned that she saw Wilson, on multiple occasions, touching McCoy and putting his arm around her, despite requests from McCoy that Wilson stop. Dkt. 43-27. She also discussed once seeing Rall "backing [McCoy] into a corner" in the medication room. *Id.*

At a deposition, Martin added details to points she made in her earlier statements. Dkt. 43-28. For instance, her first written statement noted that Wilson "offered [McCoy] a room at his place." Dkt. 43-26. Martin's deposition testimony explained that Wilson made this offer because of "bad weather or something." Dkt. 43-28 at 103:12–22. She also testified that Wilson once held McCoy's arm for at least thirteen seconds while he told McCoy that she was attractive. Dkt. 50-2 at 86:4–87:1.

With respect to Rall, Martin testified that she only witnessed one incident where he made an inappropriate comment to McCoy. This was contrary to the "multiple occasions" she noted in

her written statement. Dkts. 43-28 at 101:12–102:2; 50-4 at 120:4–7. Martin heard Rall ask out McCoy, and McCoy respond by "saying no, you know, I'm not going to go out and date you." Dkt. 43-28 at 91:13–92:4; 93:3–8. And clarifying an earlier observation in her written statement, Martin testified that she never saw any physical contact between Rall and McCoy in the medication room. She only saw Rall stand 18 inches away from McCoy and blocking her from leaving the room. Dkts. 50-4 at 117:3–118:9; 43-28 at 118:18–119:17.

### c. James Piccirilli

Piccirilli, a floor nurse, also submitted a written statement during UVA's investigation and later testified at a deposition. Dkts. 43-29; 50-5. Piccirilli stated that he and McCoy were in the medication room when Wilson interrupted in a "jovial tone" and said, "'hey, Tina . . . you're so beautiful and sexy' while caressing her left shoulder." Dkt. 43-29. Because Piccirilli found the statement inappropriate, he intervened with a strong tone, "[Wilson] what are you doing? You are being so unprofessional and inappropriate." *Id.* The incident described in the written statement was not the first time Piccirilli spoke with Wilson about making inappropriate comments to women. Dkt. 50-5 at 98:15–99:7. However, his prior discussions with Wilson "about his sexual comments, sexual jokes and sexual gestures," were completely unrelated to McCoy and concerned general observations about behavior in the modern workplace (i.e. "It's not like it was 20 years ago, or whatever."). Dkt. 43-30 at 98:15–100:2.

Piccirilli never observed any inappropriate interactions between Rall and McCoy. *Id.* at 34:11–21.

### d. Nkese Williams-Hayes

In her statement, Williams-Hayes said that she saw "[Wilson] interact with other female co-workers" and that he was "always full of compliments in a respectful manner." Dkt. 43-31.

Williams-Hayes "never once felt like [Wilson] had any sexual connotations or motives" when he interacted with her "or any other female peer[s]." *Id.* She characterized McCoy's allegations as a "shock" because she had "never heard any rumors until now about any kind of sexual allegation issues." *Id.*

### e.   Mary Ellen Cooper

Cooper, another one of McCoy's colleagues, submitted an email statement as part of the investigation. Her email stated that "[w]hen [McCoy] first came to the unit [she and Rall] talked a lot. They would ask 'to follow each other' [meaning match up for handoffs between shifts]. They would 'carry on' and [McCoy] seemed to like the attention." Dkt. 43-32. Cooper also recalled an instance "years ago" where Rall said "you are so beautiful" to McCoy, who replied, "and you are so handsome." *Id.*

### f.   Charles Wilson

In a written statement from Wilson regarding McCoy's allegations, Wilson acknowledged that he occasionally complimented McCoy on her appearance, but he believed that he did so as a friend. Dkts. 43-8 at 55:20–56:19; 43-33. He complimented her as a means of encouragement and affirmation. Wilson felt that McCoy needed encouragement because she shared intimate details with him about her divorce. *Id.* "[S]he told [Wilson] many times [about] how her husband verbally abused her by calling her names." *Id.* As a result, Wilson would "try to boost her self-image." *Id.*

Wilson denied ever inappropriately touching McCoy. *Id.* He admitted that they "would mutually place one arm around each other's shoulders from time to time like a friend or brother and sister." *Id.* According to Wilson, McCoy never told him that any touching was inappropriate, objected to any compliments, or asked him to stop any behavior. Dkts. 43-33. His statement contradicts testimony and statements made by McCoy, Martin, and Piccirilli—each of whom

10

observed McCoy telling Wilson to stop making sexual comments to her. *See* Dkts. 43-26; 43-27; 43-29; 50-4 at 75:13–76:3, 79:20–80:7; 80:24–81:11; 83:10–21; 104:3–24.

### g. Ryan Rall

Rall, in his response to McCoy's allegations, said that he and McCoy "had [] friendly banter; this include[d] a lot of laughing, joking, and smiling." Dkt. 43-34. He wrote that "over the years . . . [there were times] where [they had] been mutually complimentary of one another's appearance." *Id.* Rall denied ever telling McCoy he found her attractive, dkt. 10 at 47:10–13, but Martin's testimony suggests that Rall talked about McCoy's appearance and asked her out on dates—despite knowing she was married. Dkt. 50-4 at 88:15–91:11. Further, Rall denied ever touching McCoy in an inappropriate manner. Dkt. 10 at 47:10–13.

### 3. *Investigation Findings and Remedial Action*

The investigation concluded on or about March 27, 2018. UVA took remedial action against Wilson, counseled Rall, and implemented measures to keep McCoy and the alleged harassers separated at work. Dkts. 43-23 at UVA00365; 43-35; 43-36. Specifically, UVA issued Wilson a Performance Improvement Counseling Form at Step 3, which suspended him without pay from March 25 to March 27, 2018. Dkt. 43-35. The investigation identified "inappropriate actions" by Wilson, corroborated by "witness statements" and his own admissions. *Id.* Rall received formal counseling and was instructed that: (1) "He was not to initiate contact with Tina McCoy"; (2) "He was to remain professionally appropriate and collegial at all times"; and (3) "He [would] not be co-assigned patients with Tina, and he was not advised to be in a room or space with her without another person present to provide a witness for both him and her." Dkt. 43-36.

On March 27, 2018, Melton met with McCoy about the outcome of the investigation. During the meeting, Melton told McCoy that Wilson and Rall would be returning to work, but that

UVA "would be keeping them apart [from her] so that they wouldn't be working [alongside McCoy]. . . [a]nd that every effort would be made by leadership to prevent contact moving forward." Dkt. 43-8 at 68:9–69:10; *see* 43-10 at 16:17–17:2. McCoy claims that she understood the conditions as only being in effect for two weeks, that the conditions would not apply in the event of a patient emergency, and that it was McCoy's responsibility to ensure that a third party was present when she needed to speak with Wilson or Rall. Dkts. 50-4 at 126:8–127:11. However, Melton sent McCoy an email on April 9, 2018 which read: "Please note that there was not a time frame given in regard to giving/providing report. It was explained that your leadership would attempt this as much as possible, but due to the nature of patient care and staffing this may not always be guaranteed." Dkt. 51-2.

### C. McCoy's Leave and Resignation

McCoy never returned to work after the March 27, 2018 meeting. Dkt. 1-3 ¶¶ 63, 70. On or about April 10, 2018, McCoy requested and UVA approved Family and Medical Leave ("FMLA") retroactive to April 8, 2018 through May 4, 2018. *Id.* ¶ 82; *see* dkts. 43-37; 43-38. She requested and UVA approved an extension of FMLA leave through May 14, 2018. Dkt. 43-39.

McCoy resigned on May 14, 2018. Dkts. 1-3 ¶ 36. McCoy contends she was "constructively discharged," but her resignation email includes the subject line "Resignation." Dkt. 43-40. McCoy told Barrett that she was too nervous to return to work under the conditions set by UVA. She did not want to return if Wilson and Rall would be working there as well. Dkt. 50-10 at 192:6–15. She never worked with Rall or Wilson again.

# IV.   Discussion

### A.   Assault and Battery Against Wilson and Rall (Counts 1 and 3)

Assault in Virginia requires (1) an overt act intended to cause harmful or offensive contact to another *or* (2) an overt act intended to place the victim in reasonable fear or apprehension of imminent bodily harm. *Carter v. Commonwealth*, 606 S.E.2d 839, 841 (Va. 2005). Unlike the tort of battery, assault does not require that the victim be physically touched. *Etherton v. Doe*, 597 S.E.2d 87, 89 (Va. 2004). When evaluating whether the defendant intended to place the victim in fear or apprehension of bodily harm, "[w]ords and prior conduct are highly relevant in shedding light on intent and the context within which certain actions transpired." *Clark v. Commonwealth*, 691 S.E.2d 786, 789 (Va. 2010).

Under Virginia law, the tort of battery is "an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). "[T]he slightest touching of another . . . if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress." *Crosswhite v. Barnes*, 124 S.E. 242, 244 (Va. 1924); *see Jones v. Commonwealth*, 36 S.E.2d 571, 572 (Va. 1946) ("Battery is the actual infliction of corporal hurt on another (e.g., the least touching of another's person), wilfully [sic] or in anger, whether by the party's own hand, or by some means set in motion by him."). For contact to rise to the level of battery, it must be "offensive." Restatement (Second) of Torts § 18 (1965). "[B]odily contact is offensive if it offends a reasonable sense of personal dignity." *Id.* at § 19 cmt. a. In terms of offensiveness, an act must be judged "by an objective standard, [and] not whether the plaintiff found the act [subjectively] offensive." *Balas v. Huntington Ingalls Indus.*, 711 F.3d 401, 411 (4th Cir. 2013).

1.  *Rall*

McCoy contends that Rall assaulted and battered her. Dkt. 48 at 19. To start, there is no evidence that Rall ever touched McCoy—something which McCoy appears to concede in her opposition brief. *See* Dkt. 48 at 19. Battery requires unwanted physical touching, and the record shows that Rall never touched McCoy. Thus, there is no actionable claim of battery.

As for the assault claim, Martin saw Rall stand 18 inches away from McCoy and corner her in the medication room. Dkts. 50-4 at 117:3–118:9; 43-28 at 118:18–119:17. But the record contains no evidence in which McCoy described Rall's physical acts toward her. She did not testify that Rall put her in fear or apprehension of imminent bodily harm. There is also no evidence that Rall ever acted in a manner that McCoy interpreted to be threatening to her person. Prior to the medication room incident, testified to only by Martin, the facts indicate only that Rall made sexually-charged comments to McCoy—which were all rebuffed.

Rall's conduct toward McCoy may have been unprofessional, but his statements alone do not vault Rall's cornering of McCoy into an assault. *See Telles v. SeaWorld Parks & Entm't LLC*, No. 4:20CV6, 2020 WL 5351037, at *6–*7 (E.D. Va. Sept. 3, 2020) (dismissing a claim of assault where a SeaWorld employee, at the park's Howl-O-Scream event, whispered in the victim's ear and hollered out to startle her); *Daly v. Virginia*, No. 3:14CV250-HEH, 2014 WL 2759078, at *10 (E.D. Va. June 17, 2014) (dismissing an assault claim against Virginia ABC agents who allegedly banged on the passenger's side window of plaintiff's car and shouted at the plaintiff); *Bowles v. May*, 166 S.E. 550, 553 (Va. 1932) (holding that the facts of record were insufficient to prove a claim for assault, where the only evidence to support the claim was that the defendant shook his finger at the plaintiff "while the parties were seated and plaintiff was some eight feet or more from where defendant was sitting").

Because McCoy failed to show that Rall placed her in reasonably fear or apprehension of imminent bodily harm, no reasonable juror could find in her favor on her assault claim against Rall. Accordingly, the Court will grant Rall's motion for summary judgment as to the assault and battery count against him.

### 2.   *Wilson*

With respect to Wilson, there is a genuine dispute of material fact as to whether he assaulted and battered McCoy.

Wilson relies on *Balas*, where the Fourth Circuit rejected a battery claim when the plaintiff "objected to [a] hug" that made her feel uncomfortable. 711 F.3d at 411. But *Balas* is distinguishable from this case. While it is true that *Balas* involved allegations of ongoing sexual harassment at work, the physical touching there happened in a specific—and limited—context. Balas gave her coworker a gift of Christmas cookies. *Id.* The coworker thanked Balas and said that "she never ceased to amaze him." *Id.* He then proceeded to give her a hug. *Id.* Relying on the Restatement (Second) of Torts, the Fourth Circuit considered the "social usages prevalent at the time and place at which [the contact occurred]." § 19 cmt. a. Considering the hug in context with the Christmas cookie exchange, the Court reasoned that no reasonable juror could find the hug to be objectively offensive. *Balas*, 711 F.3d at 411.

In contrast to *Balas*, the surrounding circumstances at issue here point to an opposite conclusion—that a reasonable person could find Wilson's physical contact to be objectively offensive. There is ample evidence to show that Wilson touched McCoy in the workplace on at least three occasions and that McCoy either appeared uncomfortable, or told coworkers she was uncomfortable, with Wilson's behavior. Dkts. 50-5 at 92:20–93:4, 96:17–98:11; 43-25; 43-23 at UVA00364; 43-33; 43-8 at 141:9–22; 50-4 at 117:3–118:9; 43-28 at 118:18–119:17. These acts

occurred at a period in time when McCoy was asking Wilson to stop making sexual comments to her. *See* Dkts. 43-26; 43-27; 43-29; 50-4 at 75:13–76:3, 79:20–80:7; 80:24–81:11; 83:10–21; 104:3–24. In addition, Piccirilli testified that after Wilson caressed McCoy's forearm and shoulder, she looked "really [] scared," fearful, and uncomfortable. Dkt. 50-5 at 92:20–93:4, 96:17–98:11. Taken together, there is enough evidence for a reasonable juror to find that Wilson assaulted and battered McCoy.

Accordingly, the Court will deny Wilson's motion for summary judgment as to the assault and battery claim against him.

### B.  IIED Against Wilson, Rall, and UVA (Count 9)

McCoy's second claim against Wilson and Rall is for Intentional Infliction of Emotional Distress. The count is also asserted against UVA as being vicariously liable for Wilson and Rall's conduct. To maintain a claim for IIED, a plaintiff must show that (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *McDermott v. Reynolds*, 530 S.E.2d 902, 903 (Va. 2000); *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006) (quoting *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). Victims of "bad manners, rude behavior and hurt feelings do not state a claim for emotional distress." *Swentek v. USAIR, Inc.*, 830 F.2d 552, 562 (4th Cir. 1987). Generally, verbal abuse and use of inappropriate language is not enough to satisfy the high burden to show outrageousness. *See*

16

*Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006). The tort of IIED is "not favored" in Virginia. *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007).

It is undisputed that Wilson and Rall both made inappropriate and rude comments to McCoy. Most of the remarks that Wilson and Rall made were complimentary in nature. Statements like "[y]ou are so beautiful, damn you are just fine so hot," or "I don't care if your [sic] married or not if you change your mind let me know" are unprofessional, but McCoy has not shown that they were "so outrageous in character, and so extreme in degree," as to be considered "utterly intolerable in civilized" society. *Harris*, 624 S.E.2d at 34. As were Rall's two comments about "get[ting] hard," but they do not meet the high threshold for and IIED claim under Virginia law. *See Webb v. Baxter Healthcare Corp.*, 57 F.3d 1067, at *6 (4th Cir. 1995) (unpublished) (involving repeated ridicule based on religion, gender, and disability).

Because the conduct does not rise to the high level required of an IIED claim, the Court does not need to determine whether McCoy's emotional distress was severe. Therefore, the Court will grant Wilson and Rall's motion for summary judgment as to Count 9. Dkt. 46. Because no reasonable juror could find Wilson and Rall liable for IIED, UVA cannot vicariously liable. Thus, the Court will also grant UVA's motion for summary judgment for this claim. Dkt. 42.

## C. Title VII Hostile Work Environment (Count 10)

The final count is a claim for hostile work environment under Title VII against UVA. To prevail on a hostile work environment claim, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (internal quotations omitted).

The Court need not address the first three prongs of the hostile work environment claim because the fourth prong is fatal to McCoy's case. The record shows that there is no basis for imputing liability to UVA. "[W]hen the harasser is not a supervisor, the employer is not liable unless the employer itself was negligent in failing to take effective action to stop harassment about which it knew or should have known." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331 n.7 (4th Cir. 2012) (internal quotations omitted). "[T]he law against harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001).

There is no evidence showing that UVA knew, or should have known, about Wilson and Rall's conduct toward McCoy prior to the March 7, 2018 meeting. McCoy points to Wilson's prior sexual harassment issue in 2007 as relevant to establishing notice. But in Title VII cases, "prior harassment of other parties is relevant for establishing intent, motive, discriminatory state of mind, or notice," but only "as long as the events are not too attenuated in subject matter and time." *Glover v. Oppleman*, 178 F. Supp. 2d 622, 632 (W.D. Va. 2001). Here, Wilson's misconduct occurred nearly a decade earlier and did not involve McCoy—making the events too attenuated. Throughout late 2017 and March 2018, McCoy had access to procedures for reporting complaints of workplace misconduct but did not pursue those outlets. She did not notify UVA management about the inappropriate behavior until the March 7, 2018 meeting.

Moreover, the Fourth Circuit has held that "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Spicer v. Com. of Va., Dep't of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995). Recently, the Fourth Circuit reaffirmed this principle in *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020). *Bazemore* involved a plaintiff

18

who alleged harassment based on race and sex—conduct which he reported to Best Buy. *Id.* Best Buy conducted a two-week investigation and issued a written warning to the alleged harasser. *Id.* The plaintiff felt that Best Buy's response was inadequate. *Id.* The Fourth Circuit held that Title VII does not "prescribe specific action for an employer to take in response to [] harassment, or require that the harasser be fired, as [Plaintiff] suggests should have happened." *Id.* Instead, if the remedial action "effectively stops the harassment it will be deemed adequate as a matter of law." *Id.* at 201 (quoting *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011)).

Upon learning about the harassment, UVA immediately placed Wilson and Rall on administrative leave and undertook a three-week long investigation conducted by Employee Relations. Dkt. 43-21; 43-23 at UVA00364. When Employee Relations finished the investigation, UVA instituted remedial action against Wilson, counseled Rall, and implemented measures to keep McCoy separated from them. Dkts. 43-23 at UVA00365; 43-35; 43-36. UVA issued Wilson a Performance Improvement Counseling Form at Step 3, which suspended him without pay from March 25 to March 27, 2018. Rall received formal counseling, and Employee Relations told him not to initiate contact with McCoy and to remain professionally appropriate and collegial at all times. Dkt. 43-36. UVA management also expressed to Rall that he would not be co-assigned patients with McCoy and that he should not be in a room or space alone with her. *Id.* Additionally, Melton told McCoy that managers would keep her apart from Wilson and Rall, and that they would make "every effort" to prevent contact moving forward. Dkt. 43-8 at 68:9–69:10; *see* 43-10 at 16:17–17:2. In an email dated April 9, 2018, Melton wrote to McCoy that there "was not a time frame given in regard to giving/providing report," and that UVA leadership "would attempt [separation] as much as possible, but due to the nature of patient care and staffing this may not always be guaranteed." Dkt. 51-2. McCoy never returned to work after the March 7, 2018 meeting.

19

Accordingly, no reasonable juror could find UVA liable under a Title VII hostile work environment claim. Therefore, the Court will grant UVA's motion for summary judgment as to the Title VII claim. It follows that the question of whether McCoy is entitled to back pay or front damages is moot. Dkt. 34.

## V.      Conclusion

The Court will grant UVA's summary judgment motion in full—dismissing all counts against it. The Court will further grant Wilson and Rall's motion in part—dismissing all counts against Rall and the count 9 claim against Wilson. Thus, the assault and battery claims against Wilson are all that remain in this case. The Court will deny UVA's partial summary judgment motion, dkt. 34, as moot. An accompanying order shall issue.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this  9th   day of February, 2021.


NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE